**UNITED STATES of America,**

v.

**Carmelo BRAVO, Defendant.**

**No. S1 90 Cr. 0181 (SWK).**

United States District Court, S.D. New York.

Dec. 2, 1992.

Otto Obermaier, U.S. Atty., S.D.N.Y., New York City by Jonathan N. Halpern, for U.S.

Aranda & Guttlein by Jorge DeJ. Guttlein, Christine E. Yaris, New York City by Christine E. Yaris, for defendant.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

On August 7, 1991, the defendant, Carmelo Bravo ("Bravo"), was convicted of possessing with intent to distribute 500 grams and more of cocaine within 1000 feet of a school; using and carrying a firearm during and in relation to a federal drug trafficking crime; and, as a convicted felon, unlawfully possessing and receiving a firearm that had passed in foreign and interstate commerce. Bravo now moves, pursuant to Rule 33 of the Federal Rules of Criminal Procedure,[1] for a new trial on the grounds that the Government improperly withheld vital impeachment material, and for the ancillary relief of a reopened *Franks* hearing [2] and reconsideration of his motion to depose the confidential informant in this case who has purportedly fled to the Dominican Republic.[3]

---

1. Rule 33 provides, in relevant part, as follows: [t]he court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice.... A motion for a new trial based on the ground of newly discovered evidence may be made only before or within two years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case.

2. On March 11, 1991, a limited *Franks* hearing was held, and the Court denied Bravo's motion to suppress, finding that Bravo had not met his burden of showing that the affidavit submitted in support of the search warrant contained false statements that were made knowingly and intentionally or with reckless disregard for the truth. *See* Transcript dated March 11, 1991 ("March Tr."), at 54.

3. In an Opinion filed August 1, 1991 (the "August 1, 1991 Opinion"), the Court denied Bravo's initial application to depose the confidential in-

BACKGROUND [4]

## A. Introduction

On March 23, 1990, Bravo was arrested by Drug Enforcement Administration ("DEA") agents assigned to a unit known as "Group 33." The complaint, which was sworn to by Special Agent Roger Bach ("Bach"), alleged that:

(1) On or about March 23, 1990, fellow DEA agents executed a search warrant for the seizure of weapons and indicia of occupancy, residency or ownership at 227 West 203rd Street,[5] Apartment 4F, Bronx, New York ("Apartment 4F"), the residence of the defendant Carmelo Bravo. Shortly before they executed the warrant, the agents observed the defendant Carmelo Bravo arrive in a black car, park the car out on the street, get out of the car and enter Apartment 4F. The defendant Carmelo Bravo was in Apartment 4F while the agents executed the warrant.

(2) While searching Apartment 4F for indicia of occupancy, residency or ownership of Apartment 4F, the agents found records reflecting narcotics transactions. The agents then arrested the defendant Carmelo Bravo.

(3) Thereafter, the agents seized the black car and conducted an inventory search of the car. In the trunk of the black car the agents found approximately three kilograms of a substance which later field-tested positive for the presence of cocaine and a fully loaded .38 caliber revolver.

The affidavit in support of the search warrant referred to in the complaint, also executed by Agent Bach, detailed the circumstances leading up to Bravo's arrest. Specifically, a confidential informant (the

"CI") allegedly relayed the following information to DEA agents:

(4) On or about March 21, 1990, the CI advised DEA agents that, on or about March 20, 1990, he met with an individual who has identified himself to the CI as Carmelo Bravo. At this meeting, Bravo gave the CI $20.00 in United States currency, a machine gun and a silencer. Bravo then instructed the CI to go to Bravo's residence, located at 227 West 203rd Street, Apartment 4F, Bronx, New York and to place the machine gun and the silencer in a closet inside the apartment. Bravo stated that his wife would allow the CI to enter the apartment for this purpose.

(5) The CI followed Bravo's instructions, went to 227 West 203rd Street, Apartment 4F, Bronx, New York, where a woman he believed to be Bravo's wife, let him into the apartment. He then deposited the machine gun and the silencer in a closet inside the apartment.

After indictment, Bravo filed various pretrial motions. In support of these motions, Bravo submitted an affidavit which alleged that the agents' representations were untrue in that (1) he had never given a gun, a silencer and $20.00 to anyone; (2) at the time the agents entered his apartment to execute the search warrant, he had just gotten up and was preparing to go to court in an unrelated matter and, therefore, had not been seen driving up to and entering his apartment; and (3) the agents initially entered the apartment before the search warrant was issued. Affidavit of Carmelo Bravo, sworn to on June 25, 1990 ("June 25, 1990 Aff."). Bravo also relied on these contentions in his request for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

---

formant in the Dominican Republic by means of letters rogatory.

**4.** These undisputed facts are taken from the Affidavit of Christine Yaris ("Yaris Aff."), sworn to on January 8, 1992, the Affidavit of Assistant United States Attorney Jonathan N. Halpern ("Halpern Aff."), sworn to on March 19, 1992, and the Affidavit of Assistant United States Attorney Jonathan Halpern, sworn to on March

19, 1992, sealed on March 19, 1992, and unsealed by Order of the Court, dated June 19, 1992 ("Sealed Affidavit").

**5.** Until the time it responded to Bravo's pre-trial motions, the Government claimed that Apartment 4F was located at 207 *West* 203rd Street. The Government later conceded, however, that the apartment was actually located at 227 *East* 203rd Street.

In opposition to Bravo's motions, the Government submitted affidavits of Agent Bach and Special Agent James Hunt ("Hunt"), both of whom were at that time members of Group 33. Based on representations made in the agents' affidavits and the memoranda of law submitted, the Court denied Bravo's motions, including the motion for a *Franks* hearing. *See* Opinion dated October 9, 1990 ("October 9, 1990 Opinion"), at 10–16, 1990 WL 155703.

On March 7, 1991, Bravo moved for (1) reconsideration of his previously denied motions to suppress, and (2) suppression of his post-arrest statements on the ground that he had not been given his *Miranda* rights. In support of his motion for reconsideration of the request for a *Franks* hearing, Bravo submitted a certification by Dr. Angel Encarnacion Castillo (the "Castillo certification"), an attorney and notary public in the Dominican Republic, that, on February 20, 1991, Guido Perez Mendez— the confidential informant in this case who had fled to the Dominican Republic—had, in the presence of Dr. Castillo, made a sworn statement attributing the information which formed the predicate for the search warrant to pressure by the agents and admitting that it was a lie.[6]

On March 11, 1991, just before trial, the Court, on consent of the Government, held a limited *Franks* hearing in connection with Bravo's motion for reconsideration. At that hearing, Agent Bach, the affiant to the affidavit in support of the search war-

rant, testified that Special Agent Hunt first made contact with Guido Perez, the confidential informant in this case. March Tr., at 9. Bach also testified that Hunt told him that the informant had previously worked for another federal agency, and that the informant had proven reliable to that agency in the past. March Tr., at 9. Bach testified further that he and Hunt met with the informant in March 1990, at which time the CI told the agents about two individuals, namely Bravo and Eddie Ramirez, who were dealing in narcotics and weapons. March Tr., at 10. Specifically, the CI told the agents that Bravo "was a dealer of cocaine, and had been in possession of weapons, that the informant was solicited by Bravo to deliver the machine gun to a residence in the Bronx, and that on another occasion the informant had been in the company of Bravo and Eddie Ramirez while cocaine was being cut up at Ramirez's residence." March Tr., at 11. As a result of this information, the agents conducted a consensual search of Eddie Ramirez's residence, where they found approximately one kilo of cocaine and two semi-automatic pistols. March Tr., at 11. Having received confirmation of the CI's information, and having learned about the CI's history from Hunt, Bach applied for and received a search warrant for the home of Carmelo Bravo. March Tr., at 12.

In addition, Bach testified that he never pressured the informant to make false statements and, as far as he knew, no one

**6.** Specifically, the certification reads as follows:

That at the beginning of the year nineteen hundred ninety (1990), while he was residing in New York City, United States of America he had been the object of a serious prosecution, in those circumstances, on or about March eighteenth (18th) or twentieth (20th) of the same year, he was forced and obligated to make an accusation and to give statements before the Federal Authorities of United States against Carmelo Bravo, stating that he had used him to deliver a package to his wife at two hundred twenty-seven (227) East two hundred and third (203rd), Apartment number Four–F (4F), County of Bronx, New York, United States, this actions led to the prosecution and arrest of the above-mentioned Mr. Bravo by the Federal Authorities of that Country. That his appearance before me as a ground to make evident in the clearest way

possible that none of the accusations and statements made by him before said federal authorities against Mr. Bravo were true, that he did it under pressure and in a desperate moment when he had been the object of prosecution, but now, at this moment he is denying his original statements with this document for peace and relief of his conscience, due to the fact that he was not and he would never be able to do so in the United States because of the circumstances that he had to leave that Country. I deny said freely, voluntarily and without interest. This declaration is accusation adopted by him, and his affirmation remains firm and indefeasible with the condition that he would ratify it before any authority or officer capable at any time required in the future.

Castillo certification, attached as Exhibit "A" to Bravo's Notice of Motion.

else did either, and that the CI accepted approximately $5000 for the information he provided. March Tr., at 12–13.

After the evidentiary hearing, the Court denied Bravo's renewed motion, finding that Bravo had failed to meet his burden of showing that the affidavit submitted in support of the search warrant contained false statements that were made knowingly and intentionally or with reckless disregard for the truth. March Tr., at 54.

On March 12, 1991, this matter proceeded to trial. However, after several days of deliberation following the close of trial, the Court declared a mistrial as the jury was unable to reach an unanimous verdict. *See* August 1, 1991 Opinion, at 2 n. 1.

On June 15, 1991, in contemplation of the re-trial, Bravo moved, pursuant to Rule 15 of the Federal Rules of Criminal Procedure, for leave to depose the CI in the Dominican Republic, by means of letters rogatory. The Government opposed the motion, contending that Bravo failed to make the requisite showing of "exceptional circumstances" for the relief he was seeking. After briefing of the legal issues was completed, the Court denied Bravo's motion, relying in part on the Court's previous finding that Agent Bach's testimony at the March 11, 1991 *Franks* hearing was credible. *See* August 1, 1991 Opinion, at 5–9.

On July 24, 1991, and July 30, 1991, the Court held a hearing concerning the admissibility of a post-arrest statement which the Government intended to use at the re-trial. At the hearing, Agent Violet Szeleczky testified that she had administered *Miranda* rights to Bravo and that Bravo had indicated that he understood his rights. *See* Transcript dated July 24, 1991 ("July 24 Tr."), at 11–12, 16–17. Agent Hunt testified that after Bravo was advised of his rights, he asked Bravo about the location of the keys to the black car outside, and Bravo responded, in substance, that the keys were on a bedroom table. July 24 Tr., at 49–50. Bravo also testified at the hearing and indicated, among other things, that he had not been advised of his rights. *See* Transcript dated July 30, 1991 ("July 30 Tr."), at 27. The Court denied Bravo's

motion to suppress, finding that the defendant had been advised of his rights, that he knowingly and voluntarily had waived his rights, and that his post-arrest statement concerning the car keys was therefore admissible at trial. *See* August 1, 1991 Opinion, at 13.

### B. Re-trial

Re-trial of this matter began on August 1, 1991. The Government called 12 witnesses, including four DEA agents, four Bureau of Alcohol, Tobacco and Firearms ("ATF") agents, a chemist, an interpreter, an U.S. Attorney's Office investigator, and a Parking Violations Bureau employee. Agent Hunt and Special Agent James Clifford ("Clifford") testified that during their separate surveillances of East 203rd Street in the Bronx prior to executing the search warrant, they observed Bravo drive onto East 203rd Street in a black Buick, double-park the car in front of 227 East 203rd Street, get out of the car and enter the building at that address. Trial Transcript ("Trial Tr."), at 30–33, 376–77, 383–84. Agent Clifford testified that Bravo was alone in the car. Trial Tr., at 30–31. The CI in the case was present with Agent Hunt during the surveillance of Bravo's arrival on the scene. Trial Tr., at 374–76. After Bravo drove up to the apartment building and went inside, Agent Hunt radioed instructions to fellow agents that the person they were waiting for had arrived and that the search of the apartment was to begin. Trial Tr., at 381.

Shortly after Bravo was observed in the black Buick, DEA agents began their search of Apartment 4F, 227 East 203rd Street, and saw Bravo inside the apartment wearing a towel as he was coming out of the bathroom. Trial Tr., at 32, 34, 151. During the search, Agent Szeleczky found atop a living room wall unit, three spiral notebooks which contained detailed records of numerous drug deals. Trial Tr., at 151–53, 406–15. Agent Clifford recovered a triple-beam scale which is commonly used for weighing amounts of cocaine and other narcotics. Trial Tr., at 34–35. Agent Hunt

found approximately $4,780 in cash in a bedroom drawer. Trial Tr., at 386.

After Bravo was placed under arrest and advised in Spanish of his *Miranda* rights by Agent Szeleczky, he told Agent Hunt, in response to questioning, that the keys to the black Buick were on his bedroom dresser. Trial Tr., at 388–89. Agent Hunt then picked up a set of keys from the dresser, handed the keys to Agent Clifford, and told him to seize the Buick that was double-parked outside. Trial Tr., at 390. The car was to be seized as a drug-related asset. Trial Tr., at 390. Agent Clifford collected three other sets of keys from the apartment, cast two of the sets to the side after determining that they were keys to foreign cars or house keys, and selected the keys he believed were to the Buick. He then went outside to the car to conduct an inventory search. Trial Tr., at 36–37, 67–68.

Upon unlocking the Buick's trunk, Agent Clifford found two shoeboxes: one containing a loaded .38 caliber revolver, resting on plastic baggies containing a white powdery substance, Trial Tr., at 37, the other containing additional bags of white powder. Trial Tr., at 37. A DEA chemist testified that chemical analysis of the white powder proved that the substance was cocaine, weighing a total of approximately three kilograms, with purities ranging from 49% to 91%. Trial Tr., at 304–06, 307–08. ATF agents testified that the .38 caliber revolver successfully testfired, and that the gun had passed through both foreign and interstate commerce before it settled in the Buick trunk. Trial Tr., at 542–43, 557–60.

An official from the New York City Parking Violations Bureau testified that, based on his review of the Bureau's business records, approximately 52 parking tickets had been issued to the black Buick, a significant percentage of which were issued to the car at a distance within several blocks of Bravo's apartment. Trial Tr., at 145–46, 266–70; Government Exhibit "15." More specifically, two of the tickets were issued to the car within ten hours of Bravo's noontime arrival, and both tickets were given approximately a mile from Bravo's apartment. Trial Tr., at 268–70; Government Exhibit "15."

Finally, a criminal investigator from the United States Attorney's Office testified that, based on his measurements and calculations, the distance from the site of the car containing the cocaine to the St. Philip Neri Elementary School was well within 1,000 feet. Trial Tr., at 570, 572–73; Government Exhibit "16."

Bravo did not testify at the re-trial. However, the defense called ATF Agent Bauer on its direct case and conducted an extensive cross-examination of all Government witnesses. On August 7, 1991, the jury returned guilty verdicts on all three counts of the Indictment.

## C. Newly Discovered Evidence

Subsequent to the re-trial, on August 18, 1991, *The Daily News* published an article indicating that Group 33 agents were being "investigated for allegedly beating up suspects, snorting cocaine, gambling, having sex with an informant and lying in court." *See* Jerry Capeci, *Federal Drug Agents Tagged Nasty and Vice*, The Daily News, August 18, 1991, at 5 (the *"Daily News* article"), attached as Exhibit "A" to Yaris Aff. Specifically, the article made reference to a drug case in which hearings were held in August of 1990 before Judge Conboy. During those hearings, Judge Conboy reportedly

expressed shock, ridiculed the [Group 33] agents' stories and told [Mary Lee Warren—the chief of the narcotics unit at the time of both that case and the case at bar—] to discuss with her superiors "whether there was obstruction of justice or perjury" by the agents.

*See* Exhibit "A" to Yaris Aff.

Moreover, *The Daily News* reported that even though probes into the conduct of Group 33 by both the United States Attorney's Office for the Southern District of New York and the Professional Responsibility Squad of the DEA were still ongoing, these allegations of impropriety resulted in the disbanding of Group 33 and the placement of James Hunt—"a central figure in the probe"—in a desk job.

Essentially, the same information about the activities and methods of Group 33 was published by *El Diario* on August 19, 1991. *See* Miguel A. Sanchez, *Antidrug Unit Dismantled Due to Corruption*, El Diario, August 19, 1991, at 4, its translation, and certification of that translation, attached as Exhibit "B" to Yaris Aff. Moreover, on September 8, 1991, *The Daily News*, in the course of a lengthy article concerning the Eastern District prosecution of Thomas Pitera, again described the investigation into the activities of Group 33, and particularly of Agent Hunt. The article also referred to an affidavit submitted by Pitera which stated that attempts had been made to suborn perjury by him. *See* Jerry Capeci, *Rat Trap*, The Daily News, September 8, 1991, at 3, 33, attached as Exhibit "C" to Yaris Affidavit.[7]

D. Motion For a New Trial and Related Relief

Bravo claims that although neither he nor his defense counsel was aware of the probes into the activities of Group 33 until after the verdict in this case, *see* Yaris Aff., at ¶¶ 17, 22, the Government was, at all relevant times, namely, the *Franks* hearing, the application to depose the confidential informant in the Dominican Republic, and the re-trial, well-aware of the probes. According to Bravo, the newspaper reports make clear that the Group's propensity towards perjury was brought to the attention of supervisory attorneys in the Southern District United States Attorney's Office no later than August 1990, a full year before Bravo's re-trial. Moreover, by the time of Bravo's re-trial, Group 33 had either been disbanded or was only days away from being disbanded, and Agent Hunt had either been given restricted duty or was days away from such fate. Finally, the investigation of Group 33 was, and apparently still is, being conducted by the very same prosecutorial office that prosecuted this case. Thus, the inference is compelled that every Assistant United States Attorney trying a narcotics case, especially a case involving Group 33, knew or should have known about this potentially exculpatory and impeaching material.

However, at no time did the Government disclose this information to the defense. Bravo contends that this failure to disclose potent impeachment material, in a case which depended almost exclusively on the testimony of Group 33 agents, entitles him to a new trial, a renewed opportunity to establish that the search warrant was issued as a result of information which the agents knew to be false, and reconsideration of the denial of his motion for the deposition of the confidential informant by way of letters rogatory.

For the following reasons, the Government opposes Bravo's motion for a new trial and other related relief. First, according to the Assistant United States Attorney involved in this matter, prior to and up through the end of the re-trial in this case, he was unaware of any allegations of impropriety concerning James Hunt or other DEA Group 33 members. Halpern Aff., at ¶ 10; Sealed Aff., at ¶ 4. Second, a review of the hearings conducted before Judge Conboy, *see United States v. Huascar Lara, et al.*, 89 Cr. 1006 (S.D.N.Y.) (KC) ("*Lara*"), indicates that, while Judge Conboy found errors and inconsistencies in the sworn statements of two particular DEA agents, the Court did not find that any agent had deliberately lied under oath. In fact, Judge Conboy specifically declined to determine whether the "misstatements" in the search warrant affidavit and complaint were intentional, noting that he was "not in a position to decide that." Transcript of Hearing dated August 7, 1990 ("Conboy Tr."), at 720. Thus, there is no "finding" of intentional falsehood to provide a basis for cross-examination. Further, the Gov-

---

7. The Government has not denied the information contained in the three articles. It has, however, sought to clarify one point in the August 18, 1991 *Daily News* article. Specifically, the article discusses an incident in which Agent Hunt and others were involved in a fight with several individuals, including Steven Higgins. According to the Government, the article incorrectly implies that the incident occurred during the course of a narcotics arrest. In fact, according to information provided to the United States Attorney's Office, the incident occurred while Agent Hunt was off-duty, and, at most, amounted to a barroom brawl. Sealed Aff., at ¶ 9.

ernment contends that even if the Court's statements in *Lara* constituted a finding of intentional falsehood, that finding did not relate to Agent Hunt.

Third, according to the Sealed Affidavit, although the United States Attorney's Office had initiated an investigation into allegations concerning some members of DEA Group 33 in the spring of 1991, an investigation of the allegations concerning Agent Hunt did not begin until the summer and fall of 1991. Sealed Aff., at ¶ 4. Moreover, the Government maintains that the ongoing investigation has uncovered no exculpatory evidence, and that none of the allegations regarding any agent or the CI refers to or relates to any matter or issue in this case. Sealed Aff., at ¶ 5. Further, with the exception of Agent Hunt, none of the witnesses whom the Government called at the *Franks* hearing, the *Miranda* hearing or the trial in this case—including Special Agents James Clifford, Roger Bach and Violet Szeleczky—has been or is a subject of the United States Attorney's Office investigation. Sealed Aff., at ¶ 5. The Government further contends that although the investigation is ongoing and has uncovered allegations of impropriety in other cases that might provide potential impeachment material of Agent Hunt,[8] to date, no grand jury or administrative body has made any findings as to Agent Hunt or any other Group 33 agent. Sealed Aff., at ¶ 6.[9]

Finally, the Government argues that, in light of the other credible proof conclusively establishing Bravo's guilt, the allegations against Agent Hunt and other Group 33 agents do not undermine the integrity of Bravo's conviction. In other words, the Government argues that there is no possibility that the outcome of Bravo's re-trial would have been different had the information in question been disclosed, or had the very limited evidence offered solely through Agent Hunt been excluded. Specifically, the principal evidence in the case—the recovery of approximately three kilograms of cocaine and a loaded revolver found together in a car that Bravo had been observed driving, and the drug records and a scale from Bravo's own apartment during his presence—remains totally unaffected. In addition, the testimony of Agent Clifford, who independently observed Bravo driving the car that contained drugs and a loaded gun, also remains totally unaffected. Therefore, Bravo's motion for a new trial and other ancillary relief should be denied.

## APPLICABLE LAW

It is well established that a motion for a new trial based on newly discovered evidence may be "granted only with great caution ... in the most extraordinary circumstances." *See, e.g., Sanders v. Sullivan,* 863 F.2d 218, 225 (2d Cir.1988) (quoting *United States v. DiPaolo,* 835 F.2d 46, 49 (2d Cir.1987)). The requisite "extraordi-

---

**8.** The Assistant United States Attorney in charge of the investigation has summarized the allegations against Agent Hunt as follows: (a) Agent Hunt assisted another agent in making payments to an informant to which the informant was not entitled; (b) Agent Hunt was "present" when an unauthorized sample of marijuana was given out by an informant and "had reason to know" that the sample was released; (c) Agent Hunt signed DEA forms authorizing payments to informants for cases regarding which the informants state they were not involved in and did not receive any money; (d) Agent Hunt beat up three defendants; (e) Agent Hunt received money back from an informant as "kickbacks;" (f) Agent Hunt and other agents broke into a safe without the owner's permission; (g) Agent Hunt and another agent exceeded the lawful scope of a search and then lied at the subsequent suppression hearing regarding the location from which items were seized. (*United*

*States v. Huascar Lara, et al.,* 89 Cr. 1006 (S.D.N.Y.)). Sealed Aff., at ¶ 7.

**9.** The Government concedes, however, that Otto Obermaier, the United States Attorney for the Southern District of New York, recommended to the DEA that certain of the allegations against Agent Hunt be referred for possible administrative action. In particular, Mr. Obermaier referred allegations (d), (f) and (g), discussed above in footnote 7, to the DEA for administrative action. In view of how such disclosure might affect the credibility of Agent Hunt, and of some other agents, Mr. Obermaier also recommended that the DEA consider reassigning them to duties that would not require that they testify. The DEA recently has initiated administrative proceedings against Agent Hunt and other agents. Sealed Aff., at ¶ 8.

nary circumstances" are present only when the defendant establishes, among other things, that the new evidence would "probably lead to an acquittal." *United States v. Parker*, 903 F.2d 91, 102 (2d Cir.) (quoting *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir.1980)), *cert. denied*, — U.S. —, 111 S.Ct. 201, 112 L.Ed.2d 162 (1990).

■ Nondisclosure of evidence, including matters relating to the credibility of Government witnesses, *see Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), does not violate due process unless the evidence is both favorable to the defendant and "material either to guilt or punishment." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963). To establish materiality, a defendant must show that there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Petrillo*, 821 F.2d 85, 89 (2d Cir.1987) (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481; *id.* at 685 (White, J., concurring in part and concurring in judgment) (1985)). A "reasonable probability" in this context means "'a probability sufficient to undermine confidence in the outcome' of the case." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383 (quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984)); *see also United States v. Salerno*, 868 F.2d 524, 541 (2d Cir.) (application of *Bagley* test), *cert. denied*, 491 U.S. 907, 109 S.Ct. 3192, 105 L.Ed.2d 700 (1989); *United States v. Serna*, 799 F.2d 842, 847–48 (2d Cir.1986), *cert. denied*, 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 494 (1987). Where, "a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict," a new trial is not warranted. *Giglio*, 405 U.S. at 154, 92 S.Ct. at 765 (1972) (quoting *United States v. Keogh*, 391 F.2d 138, 148 (2d Cir.1968)).

■ In addition, "new evidence" that is merely additional impeachment material does not warrant a new trial. *See United States v. Gilbert*, 668 F.2d 94, 96 (2d Cir. 1981), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982). In fact, courts are hesitant to grant a new trial based on impeachment material pertaining to a collateral matter. *See, e.g., United States v. Whitley*, 905 F.2d 163 (7th Cir.1990) (no new trial granted where chemist who testified at the trial was convicted of stealing cocaine in other cases).

■ The standard in cases where the suppression or nondisclosure by the Government is deliberate, however, is much less stringent. If it can be shown that the Government deliberately suppressed evidence, a new trial is warranted if "the evidence is merely material or favorable to the defense." *United States v. Kahn*, 472 F.2d 272, 287 (2d Cir.), *cert. denied*, 411 U.S. 982, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973). The materiality of the evidence to the defendant "is measured by the effect of its suppression upon preparation for trial, rather than its predicted effect on the jury's verdict." *United States v. Kahn*, 472 F.2d at 287.

## DISCUSSION

■ The crux of Bravo's motion for a new trial is that the Government improperly withheld from him information which would fall under the mandate of *Giglio* and *Bagley*. According to Bravo, the Government was, at all relevant times, well aware of the investigation into the activities of Group 33, and specifically, the investigation of Agent Hunt, yet failed at any point in the proceedings to advise Bravo of the pending investigations into the possibly criminal, and certainly grossly improper, conduct of the agents who were primarily responsible for the prosecution. Bravo further argues that this failure entitles him to a new trial because had this information been disclosed there was a "reasonable probability" that the result of the re-trial would have been different. The Court agrees.

### A. Preliminary Issues

Before reaching the issue of whether Bravo is entitled to a new trial, some pre-

liminary issues must be addressed. First, although the Government contends that the ongoing investigation into Group 33 has uncovered no exculpatory evidence, *see* Sealed Aff., at ¶ 5, and that none of the allegations regarding any agent refers to or relates to any matter or issue in this case, *id.*, it is undisputed that the investigation into the activities of Group 33 is ongoing and has "uncovered allegations of impropriety in other cases that might provide potential impeachment material of Agent Hunt." Sealed Aff., at ¶ 6; *See Giglio*, 405 U.S. 150, 92 S.Ct. 763.

Second, the Court finds that the Government's failure to disclose *Giglio* material cannot be excused on the basis that the Government lacked knowledge of the investigation into the conduct of Group 33 agents, or that Judge Conboy never made formal findings that any Group 33 agent deliberately lied under oath. With respect to the Government's knowledge, the Court finds that at all times relevant to the *Franks* hearing, the application to depose the confidential informant in the Dominican Republic, and the re-trial, the Government was well-aware of the allegations of perjury and other improper or illegal conduct levelled against members of Group 33.[10] The newspaper reports discussed above confirm that the Group's propensity towards perjury was brought to the attention of supervisory attorneys in the Southern District United States Attorney's Office no later than August of 1990, at the *Lara* hearings, a full year before Mr. Bravo's retrial. Specifically, at the *Lara* hearings Judge Conboy, commenting on the testimony of Agent Hunt and other members of Group 33, stated that:

It's one thing to have agents or policeman or any witness be candid and say, "Yes, a mistake was made." And if that

were all there was here, if there was just one witness, but every one of them [including Agent Hunt] *presented extraordinarily confusing and problematic testimony.* Lara Tr., at 716–717 (emphasis added).

Now, surely, there is something more here than simply—with respect to the scale than simply a failure of recollection or a deviance from some formal rule of the DEA. I mean, that *testimony with respect to the scale bordered on the preposterous.* Lara Tr., at 717 (emphasis added).

Now, the gun, we have, I don't know, four or five different versions of how the gun essentially reaches this table as an exhibit. We have one officer saying he raised the gun and shouted and alerted everyone. No one else seems to recall that. The second agent says he saw it and said nothing, even though it was within the reach of defendants. We have this agent, the final agent who testified, McKenna, saying he looked at the table, he looked at the bed and he looked at the floor and didn't see the gun. Now, it may have been on the ceiling, or it may have been dangling out of the window on a rope. Those two, we didn't hear in this hearing. *But there is just an artificiality to this. There is something that is extraordinarily makeshift about how they come in here.* Lara Tr., at 717–18 (emphasis added).

And then we get to the critical evidence in the case, which is all this powder on the floor. We're told in one statement to the United States Attorney that the informant and the agent were sweeping it up. We're told by Welsh that he said that he meant to suggest to the U.S. Attorney that there wasn't any simultaneous sweeping. I mean, please. *Come*

---

**10.** Assistant United States Attorney Jonathan Halpern's statements that he had no personal knowledge of the investigations into the conduct of Group 33 until after *The Daily News* published an article by Jerry Capeci on August 18, 1991, does not warrant a different result. For purposes of *Brady*, as well as most other obligations, the Government is but a single entity, each member of which is charged with the knowledge of the whole. *United States v. But-*

*ler*, 567 F.2d 885, 889, 891 (9th Cir.1978). As the Supreme Court has stated, "[t]he staff lawyers in a prosecutor's office have the burden of 'letting the left hand know what the right hand is doing' or has done." *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971). Thus, as long as the Court finds that the United States Attorney's Office had knowledge of the investigations, knowledge on the part of Mr. Halpern will be presumed.

*into the real world. This is a technique or a device to paper over a substantial problem with respect to this. Lara* Tr., at 718 (emphasis added).

And what I must say to you is that, as I said before, it's one thing to have a deviation from a regulation and candor. We come in and we admit freely. These agents didn't come in and admit freely. It's [Assistant United States Attorney] Martinez that stimulated it. *Lara* Tr., at 719.

*I think the government should very carefully re-examine this case. And I think it should be reviewed at a higher level in the office than you. And I think you should consider this. This is the integrity of the United States Attorney's Office and the DEA which transcends the question of whether these defendants are convicted or whether these agents get off the hot spot ... Lara* Tr., at 719–20 (emphasis added).

That affidavit and that complaint and the grand jury testimony? *That's a lot more than a simple mistake or a deviation. It is riddled with falsehoods in there. I'm not saying intentional. I'm not in a position to say that. That's the U.S. Attorney's job to decide whether there was obstruction of justice or perjury. Lara* Tr., at 720 (emphasis added).

Moreover, it is undisputed that both the United States Attorney's Office for the Southern District of New York and the DEA Office of Professional Responsibility initiated an investigation of allegations concerning some members of DEA Group 33 in the spring of 1991. Sealed Aff., at ¶ 4.[11] Although the Government, in an effort to avoid a new trial, maintains that it did not begin to investigate the allegations against Agent Hunt until the summer and fall of 1991, Sealed Aff., at ¶ 4, clearly the United States Attorney's Office was aware of certain of the allegations against Hunt prior to the time of Bravo's pre-trial. First,

since summer begins on June 21, and Bravo's re-trial did not start until August 1, 1991, the Court can infer that certain of the allegations against Hunt were already under investigation at the start of the trial. Second, if Agent Hunt had not been under investigation for some time by August of 1991, there would have been no reason for him to be reassigned to desk duty at or around that time, as *The Daily News* reported on August 18, 1991. *See* Exhibit "A" to Yaris Aff.

Further, knowledge on the part of the Government of Hunts' improprieties can be inferred because *The Daily News* article, printed on August 18, 1991, only 11 days after the verdict in the Bravo re-trial, indicates that Group 33 was disbanded sometime prior to August 18, 1991, and that Hunt was placed in a headquarters unit earlier in the year. *See* Exhibit "A" to Yaris Aff.

Nor can the Government disclaim responsibility for non-disclosure of *Giglio* material by claiming that, "while Judge Conboy found errors and inconsistencies in the sworn statements of two particular DEA agents, the Court did not find that any agent deliberately lied under oath.... [t]hus, there is no 'finding' of intentional falsehood to provide a basis for cross-examination." Halpern Aff., at ¶ 10. While it is true that Judge Conboy did not find that any agent deliberately lied under oath, it is clear from the portions of the *Lara* record cited above that Judge Conboy did not have to make such an explicit finding to get his point across. Moreover, the fact that Judge Conboy declined to make an explicit finding as to whether Group 33 agents had intentionally lied, does not mean that Judge Conboy's statements regarding the agents' testimony do not provide a basis for cross-examination. Rule 608 of the Federal Rules of Evidence allows impeachment of witnesses by evidence of specific instances

---

**11.** For purposes of the instant motion it is irrelevant whether the investigation actually began earlier than the spring of 1991 because Bravo's re-trial was in August of 1991. The Court finds it difficult to believe, however, that in light of

Judge Conboy's criticism of Group 33 agents, and suggestion that an investigation be made on August 8, 1990, *see Lara* Tr., at 720, 723–24, that the United States Attorney's Office did nothing until the spring of 1991.

of dishonesty regardless of whether there has been an official finding to that effect.[12]

### B. New Trial

■ Despite the Government's knowledge of the investigations into the conduct of Group 33, and more relevant, its knowledge of allegations against Agent Hunt, the Government failed to disclose any of this information to the defense. The question thus becomes whether this non-disclosure of "allegations of impropriety in other cases that might provide potential impeachment material of Agent Hunt," Sealed Aff., at ¶ 6, or *Giglio* material requires a new trial.[13] The Court finds that it does because there is a "reasonable probability that, had the evidence [regarding Agent Hunt] been disclosed to the defense, the result of the proceeding would have been different." *United States v. Petrillo*, 821 F.2d at 89 (quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383).

The Government argues that none of the allegations concerning Hunt relate to any issue in Bravo's case. Nor does any relate to exculpatory evidence, pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Nor is there any claim that Agent Hunt did not give credible testimony at trial.

The Government further argues that even assuming that the allegations concerning Agent Hunt were credited, there is no reasonable possibility—much less a reasonable probability—that the outcome of Bravo's trial would have been different had the information in question been disclosed or had the very limited evidence offered solely through Agent Hunt been excluded. While certain of the allegations arguably might be used for supplemental cross-examination of Agent Hunt, they leave the critical evidence in this case unaffected.

According to the Government, although an important witness, Agent Hunt was not the central or key witness of the Government's case. In fact, at the re-trial, the Government called 12 witnesses, and it was Agent Clifford, not Hunt, who found the loaded gun and cocaine during an inventory search of the black Buick that Bravo had been seen driving minutes earlier. Trial Tr., at 31–32. Agent Hunt did not even know about the recovery of this evidence until after he left the scene. Trial Tr., at 390–91.

Nor did Agent Hunt recover from Bravo's apartment the three notebooks which contained detailed notations of drug deals of various quantities for large sums of money. Agent Szeleczky testified that she found this evidence of drug dealing on the top of a wall unit in the living room of the apartment. Trial Tr., at 151–52. Moreover, it was Agent Clifford who found and testified about additional evidence of drug trafficking in Bravo's apartment, namely, the triple beam scale. Trial Tr., at 26, 30.

Further, the Government contends that a review of the evidence demonstrates that Agent Hunt was corroborated on several of the matters about which he testified. For

---

**12.** Federal Rule of Evidence 608 provides, in relevant part, that:

(b) Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness....

**13.** Because Assistant United States Attorney Jonathan Halpern indicates in the Sealed Affidavit that "with the exception of Special Agent Hunt, none of the witnesses whom the Government called at the *Franks* hearing, the *Miranda* hearing or the trial in this case—including Special Agents James Clifford, Roger Bach and Violet Szeleczky—has been or is a subject of this Office's investigation," Sealed Aff., at ¶ 5, in determining whether Bravo is entitled to a new trial, the Court will focus on the allegations against Agent Hunt, and the failure of the Government to disclose to the defense potential impeachment material of Agent Hunt. The Court finds, however, that the Government has been less than forthcoming with respect to disclosing information pertinent to other agents of Group 33. While Mr. Halpern purports to have spoken with an investigator with the DEA's Office of Professional Responsibility, Sealed Aff., at ¶ 3, there is no reference to any investigation or inquiry that might have been conducted by the Office of Professional Responsibility of the agents who testified in this case, let alone the results of any such investigation or inquiry.

example, Hunt's testimony regarding his observations of Bravo's driving and double-parking the black Buick on East 203rd Street was fully corroborated by Agent Clifford, who testified that he was surveilling the scene from a different car, and that he likewise saw Bravo drive up in the Black Buick, double-park the car in front of 227 East 203rd Street, get out of the car and go inside the building at that address. Trial Tr., at 30–31. Agent Clifford also testified that, after seeing Bravo arrive, he received instructions over the radio that the search of the apartment was ready to take place. Trial Tr., at 31–32. This testimony further corroborates Agent Hunt's testimony that, while accompanied by an informant, he saw Bravo and then instructed his fellow agents over the radio, in substance, that the search could proceed since the person they were waiting for had arrived. Trial Tr., at 374–77, 381.

Agent Clifford also corroborated the fact that Agent Hunt, in connection with his instructions to Agent Clifford to seize the black Buick, handed him a set of keys. Trial Tr., at 35–36. Although there is no other witness to Bravo's specific post-arrest statement to Agent Hunt that the keys to the black Buick were on his bedroom dresser, the Government claims that an evaluation of all the relevant circumstances strongly underscores the reliability of Hunt's testimony about Bravo's statement.

For example, Agent Hunt had no reason to know that there would be contraband inside the car; the search warrant covered the apartment only. Agent Hunt's reason for asking for the car keys was to expedite the inevitable: the seizure of the car as a drug-related asset. This step followed the discovery of extensive drug records, drug paraphernalia and a sum of currency [14] in Bravo's apartment.

Moreover, the question about the keys that was put to Bravo was entirely logical, as Agents Hunt and Clifford had seen Bra-

vo drive and get out of the car just minutes earlier. Since the agents were already searching the apartment, they were going to find the Buick keys sooner or later anyhow. Bravo's answer merely provided the keys sooner.

The circumstances of Bravo's appearance also lend credence to Hunt's testimony on Bravo's statement about the car keys. When agents first entered the apartment, approximately 15 to 30 minutes after having seen Bravo in the Buick, Bravo was coming out of the bathroom all wet with only a towel wrapped around him. Trial Tr., at 32. It appeared that Bravo had just stepped from the shower when the agents began their search. Accordingly, the bedroom dresser is just the site where one would expect to find a set of keys that have been placed there by its owner on his way to the shower. This especially would be the case where that person had just double-parked his car and entered his apartment, hurriedly attempting to shower and change clothes, and ostensibly preparing to leave.

▆ While the Government argues that all the circumstances strongly support the reliability of Hunt's testimony concerning the statement, the Government also maintains that even if the statement and evidence of the recovery of $4,780 were excluded from the totality of the evidence received at trial there still would be ample independent proof to support the jury verdict. That the evidence received at trial was offered through numerous witnesses underscores the fact that Bravo's conviction does not depend principally on Agent Hunt or any other witness. In addition, the existence of the corroboration and independent evidence in this case weighs heavily against the awarding of a new trial for the nondisclosure of impeachment material. *See e.g., United States v. Petrillo*, 821 F.2d at 89 (no new trial where key aspects of

---

**14.** The Government claims that although no other witness observed Agent Hunt's recovery of the approximately $4,780 in currency from the apartment bedroom, Agent Bach testified that he received from Hunt for processing and safekeeping that very sum of currency. Trial Tr., at

259–61. The Government also argues, however, that even if the Court were to discount the testimony concerning the currency, there remains a plethora of telling evidence upon which Bravo's conviction soundly rests.

witness' testimony corroborated by other testimony); *United States v. Gilbert,* 668 F.2d 94, 96 (2d Cir.1981), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982) ("ample independent evidence" that either implicated the defendant directly or corroborated the witness' testimony); *United States v. Provenzano,* 615 F.2d 37, 47–49 (2d Cir.1980) (corroboration of witness' testimony identifying defendant's voice and other substantial evidence of defendant's guilt); *United States v. Rosner,* 516 F.2d 269, 274–78 (2d Cir.1975) ("far more evidence" than witness' testimony supported conviction); *United States v. Morales,* 660 F.Supp. 1543, 1545–46 (S.D.N.Y.1987) (direct and circumstantial evidence supported testimony of only eyewitness).

The Court disagrees with the Government's interpretation of the testimony and evidence presented at Bravo's re-trial. Contrary to the cases cited above, this is not a case "in which the material at issue is merely 'additional evidence tending *further* to impeach the credibility of a witness whose character had already been shown to be questionable.' " *United States v. Morales,* 660 F.Supp. at 1544–45 (quoting *United States v. Rosner,* 516 F.2d at 273–74). Nor can it be said that this is a case involving a marginal witness whose testimony was credibly corroborated by other witnesses. Although only one of twelve witnesses, Agent Hunt was a key witness at the re-trial whose often uncorroborated testimony was critical to Bravo's conviction. Thus, the Court finds that there is a reasonable probability that the outcome of Bravo's trial would have been different had the information concerning Hunt's credibility and character been disclosed or had the evidence offered solely through Agent Hunt been excluded.

First, although it is true that Agent Clifford, not Agent Hunt, found the loaded gun and cocaine during an inventory search of the black Buick, Trial Tr., at 37–38, it was Agent Hunt's testimony that established Bravo's connection with the black Buick, and thus, with the cocaine and firearm. Agent Hunt testified that he observed Bravo drive up in a black Buick, double-park the car in front of 227 East 203rd Street, get out of the car and go inside the building at that address. Trial Tr., at 376–78, 381, 383–84. The Government maintains that this testimony was corroborated by Agent Clifford. A closer examination of the record, however, reveals that only Agent Hunt consistently and conclusively testified that it was Bravo who was seen driving and double-parking the black Buick on East 203rd Street. While Agent Clifford testified that he too saw Bravo drive up in the black Buick, double-park the car in front of 227 East 203rd Street, get out of the car and go inside the building, Trial Tr., at 30–34, it was also established that at a prior proceeding Clifford described the five foot two, 115 pound Bravo, as five foot seven or five foot eight and 160–70 pounds. Trial Tr., at 33, 52, 54–60. In addition, on cross-examination Agent Clifford stated that two other male Hispanics were present in the apartment when the agents executed their search warrant, and that it was possible that one of them weighed approximately 160–170 pounds and was five foot seven or five foot eight. Trial Tr., at 63.[15] Thus, had Agent Hunt's credibility been impeached or had his testimony regarding his observations of Bravo driving up to the apartment been excluded, there would have been very little credible evidence establishing a connection between Bravo and the black Buick where the cocaine and firearm were found.

Second, although Agent Szeleczky testified that she found three notebooks containing notations of drug deals, Trial Tr., at 152, and the jury was instructed to make its own independent judgment as to what

---

**15.** Moreover, since it was only Hunt who was able to consistently identify Bravo and connect him with the black Buick, if the impeachment material of Hunt had been disclosed to the defense, there is a reasonable probability that the jury would have considered more seriously the testimony of Joseph F. Miller, an employee of the City of New York Parking Violations Bureau, that Bravo was not the registered owner of the black Buick containing the cocaine and loaded gun. Trial Tr., at 144–147.

the notebooks contained, Trial Tr., at 415, it was Agent Hunt who provided detailed expert testimony about the meaning of the records. For example, Hunt testified that the numbers in the notebooks "are very common weights when dealing with narcotics, either cocaine or heroin." Trial Tr., at 407. Hunt also testified that the names with corresponding dollar amounts next to them signified money that was owed. Trial Tr., at 408. Moreover, Hunt testified that based on his review of the notebooks, the person who owns the books is "more or less running the operation or fronting narcotics." Trial Tr., at 410. Further, Hunt testified that in his expert opinion, the notebooks contained records of narcotics trafficking. Trial Tr., at 421–22.

Third, Agent Hunt is the only witness who testified that he asked Bravo where the keys to the black Buick were, and Bravo responded that the keys were on the dresser in the bedroom. Trial Tr., at 389. This testimony was especially significant because, like Hunt's testimony that he saw Bravo driving the black Buick, it further connected Bravo to the black Buick in which the cocaine and gun were found. Without this testimony and without Hunt's testimony that he saw Bravo drive up in the black Buick, there is a reasonable probability that a jury would find that Bravo had no connection to the black Buick, the cocaine or the loaded gun.

Moreover, although the Government maintains that there were other indicia of reliability with respect to Hunt's testimony as to Bravo's statement, the Court finds that an evaluation of all the relevant circumstances underscores the unreliability of Hunt's testimony. For example, Hunt testified that Bravo told him that the keys to the black Buick were on the dresser in the bedroom. Yet, Hunt also testified that prior to his conversation with Bravo he had searched the bedroom, including the bedroom dresser, found only U.S. currency,

Trial Tr., at 386, and did not take any keys out of the bedroom. Trial Tr., at 463. Additionally, although Agent Hunt testified that Bravo told him that the keys to the Buick were in the bedroom, he never indicated in any prepared report that the defendant made that statement. Trial Tr., at 465–66. Further, although Agent Clifford corroborated that Hunt handed him a set of keys, Trial Tr., at 36, he did not know whether that set of keys were the keys to the black Buick. Trial Tr., at 66. In fact, at a prior proceeding, Clifford testified that he found the Buick keys on the coffee table, near where the two other Hispanic males were standing. Trial Tr., at 66–67.

Finally, no other witness observed Hunt's recovery of the approximately $4,780 in currency from the apartment bedroom.

Thus, the Court finds that had the impeachment material been disclosed to the defense, or had the evidence offered solely through Agent Hunt been excluded, there was a reasonable probability that the jury would have found that there was no credible identification of Bravo driving up to the apartment building in the black Buick which contained the cocaine and loaded firearm. Without Hunt's testimony regarding Bravo's statement, it is also likely that the jury would have found that there was no other credible evidence establishing Bravo's connection to the Buick. Further, without the currency in evidence, and without Hunt's testimony as to the alleged drug records, the jury would have found the case against Bravo on the cocaine charge extremely slim, consisting solely of the scale found by Agent Clifford in the apartment. Accordingly, the Court finds that there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the [trial] would have been different," and therefore Bravo is entitled to a new trial.[16]

---

**16.** Based on this determination, the Court need not make a finding as to whether the non-disclosure by the Government was deliberate and in bad faith, justifying use of a less stringent standard. However, the Court notes that based on the information before it, it could make a finding that the non-disclosure by the Government was deliberate and in bad faith. As discussed above, the Government was aware at all relevant times of the material in question. Moreover, there can be no question that the United States Attorney's Office recognized the

**326**

### C. Ancillary Relief

Bravo also seeks the ancillary relief of a reopened *Franks* hearing and reconsideration of his motion to depose the confidential informant in the Dominican Republic.

The Court finds that had it known of the allegations against Agent Hunt and other Group 33 agents at the time of Bravo's pretrial motions, it would have ordered a full *Franks* hearing, with Agent Hunt as well as Agent Bach testifying. Moreover, had the Court been made aware of the allegations, it would have found that "exceptional circumstances" existed, *see* Rule 15 of the Federal Rules of Criminal Procedure, justifying the deposition of the confidential informant in the Dominican Republic. Thus, the Court finds that Bravo is also entitled to his requested ancillary relief. Accordingly, prior to the new trial in this matter, Bravo shall have the opportunity to depose the confidential informant in the Dominican Republic by means of letters rogatory, and there shall be another *Franks* hearing, with both Agents Hunt and Bach testifying.

### CONCLUSION

For the reasons set forth above, Bravo's motion for a new trial, pursuant to Rule 33 of the Federal Rules of Criminal Procedure, is granted. Further, Bravo's request for ancillary relief, namely, a reopened *Franks* hearing and reconsideration of his motion to depose the confidential informant in this case, is also granted. The parties shall contact the Court to schedule both the *Franks* hearing and the new trial.

SO ORDERED.

significance of the non-disclosed material to the case at hand.