**UNITED STATES of America,**

v.

**Eric MILLAN–COLON, et al., Defendants.**

**No. S9 91 Cr. 685 (SWK).**

United States District Court, S.D. New York.

July 30, 1993.

---

See also 824 F.Supp. 38.

Mary Jo White, U.S. Atty. S.D.N.Y. Office of U.S. Atty., New York City by Dietrich L. Snell, Roland G. Riopelle, for U.S.

Law Offices of Benjamin Brafman, P.C., New York City by Benjamin Brafman, Katherine Renee Frohock, for Vincent Basciano.

Maurice H. Sercarz, New York City by Maurice H. Sercarz, for Alfred V. Bottone, Sr.

David Breitbart, New York City by David Breitbart, for Alfred Bottone, Jr.

Gerald LaBush, New York City by Gerald LaBush, for Anthony Bottone.

David S. Greenfield, New York City, for Myles Coker.

Roger J. Schwarz, New York City, for Jose Colon.

Michael B. Pollack, New York City, for Eric Millan.

Golub & Dunn, New York City by Mitchell Golub, for Noel Melendez.

Valerie Amsterdam, New York City, for Carmen Mendoza.

Charles Lavine, Forest Hills, NY, for William Mendoza.

Anthony Cueto, New York City, for John O'Rourke.

David Richman, New York City, for Ralph Rivera.

Kenneth D. Wasserman, New York City, for Samanta Torres.

Harwood & Neville, New York City by James C. Neville, for Larry Weinstein.

### MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

On March 8, 1993, trial commenced in the above-captioned heroin conspiracy case. On April 16, 1993, the Court declared a mistrial. Defendants Vincent Basciano, Alfred V. Bottone, Sr., Alfred Bottone, Jr., Anthony Bottone, Jose Colon, Myles Coker, Noel Melendez, Eric Millan–Colon, John O'Rourke, Ralph Rivera, Samanta Torres and Larry Weinstein now move to (1) preclude retrial under the Double Jeopardy Clause of the Fifth Amendment; (2) dismiss the indictment based on "outrageous Governmental conduct"; (3) delay the retrial pending further investigation of allegations of law enforcement corruption; (4) permit the filing of additional pre-trial motions; (5) obtain further discovery; and (6) withdraw guilty pleas. Eric Millan ("Millan") also moves for the release of certain funds seized and forfeited by the Drug Enforcement Administration ("DEA") in connection with this action. The Government opposes the defendants' motions and cross-moves, with respect to Millan only, for an order directing Millan to retain new counsel or accept assigned counsel to replace Michael B. Pollack, his trial attorney in this case.

### BACKGROUND

Indictment S9 91 Cr. 685 (SWK)—which was returned on October 5, 1992—marked the last in a series of indictments and informations charging a total of forty persons with, among other things, participating in a heroin distribution conspiracy known as "Blue Thunder", after the principal brand name of the heroin allegedly distributed by the organization on the streets of New York City from 1986 until 1991. On March 1, 1993, trial commenced as to eleven "Blue Thunder" defendants.[1]

1. *The Blue Thunder Trial*

Jury selection began in this case on March 1, 1993. By March 8, 1993, jury selection was complete, and the trial commenced with the Government's opening statement. Included in the Government's opening statement were several references to New York State Police Investigator Robert Robles ("Robles"), an undercover agent assigned to the New York Drug Enforcement Task Force ("NYDETF"), who had participated in

---

1. Since August 14, 1991, twenty-five defendants pled guilty; two defendants were dismissed from the case; and two are fugitives.

the Blue Thunder investigation. Specifically, the Government stated that:

The evidence will show that on November 2, 1990, ... Noel Melendez, helped Marcus Delgado and another man named Vincent Roman sell 600 glassines of "This is it" heroin, the heroin being packaged by Miguel Kercado, to a customer named Bobby, a customer who said he was from out of town.

Now, unbeknownst to the defendants, ... you will learn that Bobby, the customer from out of town, was actually Investigator Robert Robles of the New York Drug Enforcement Task Force, and he was acting on an undercover assignment on November 2, 1990....

The evidence will show that a couple of weeks after this first contact between Bobby Robles and the Blue Thunder and "This is it" organization, Robles met directly, face-to-face, with Jose Colon, Miguel Kercado's distribution manager. In this conversation that was had between the undercover officer and Jose Colon, the undercover told Colon that he wanted to buy Blue Thunder, and the evidence will show that in response, Jose Colon said that "This is it", the stuff that he already sold to the undercover, was being supplied by the same people and was the same stuff.

About a week later, on November 28, 1990, Investigator Robles bought another thousand glassines of heroin directly this time from Jose Colon.... Investigator Robles would buy heroin from Jose Colon on two more occasions; December 20, 1990 and January 31, 1991. By the end of January 1991, the evidence will show that Investigator Robles had established himself as such a good customer that he obtained the telephone number for a mobile telephone that Jose Colon was using in his business ...

Now, although the mobile telephones were very important for the defendants to be able to function efficiently, the evidence will show that these phones also led to the defendants' downfall because on January 28, 1991, just shortly after Jose Colon gave out his mobile telephone number to Bobby Robles, the NYDETF got a court order, a federal court order, authorizing the task force to listen in on the conversations that Jose Colon was having ...

The evidence will show that they intercepted conversations relating to the January 31, 1991 undercover buy by Investigator Robles. You will hear Investigator Robles speaking with Jose Colon over his telephone to arrange that transaction.

*See* Trial Transcript ("Tr.") at 39–42.

Almost immediately after the Government's opening, the trial was beset by a stream of unanticipated events. On March 11, 1993, the first day of testimony, the Court granted the application of defendant Carmen Mendoza for a severance based on medical reasons. The following day, March 12, 1993, the Government notified the Court and defense counsel of the narcotics-related arrests of Robles, New York City Police Detective Jeffrey Beck ("Beck") and New York City Police Sergeant Joseph Termini ("Termini"), all of whom had participated in the investigation that culminated in the Blue Thunder arrests. Apparently, since December 1992, the Government had been investigating the activities of Robles, Beck and Termini in connection with, among other things, distributing heroin. Thus, by the time the Government delivered its opening statement, a sworn criminal complaint had already been filed under seal charging the three officers with narcotics trafficking.

Following the Government's revelations, the defendants moved for various forms of relief, including dismissal of the indictment and, alternatively, discovery of the Government's investigative file concerning the arrested officers. Tr. at 510–15. In response to these motions, the Court directed the Government to submit *ex parte* affirmations describing both the arrested NYDETF officers' participation in the Blue Thunder investigation and their alleged misconduct with respect thereto. Tr. at 588. On March 17, 1993, the Government submitted two affirmations under seal for the Court's review. *See* Affirmation of Assistant United States Attorney Dietrich L. Snell, dated March 17, 1993; and Affirmation of Assistant United States Attorney David B. Fein, dated March 17, 1993. According to the Affirmations, the

Government's position at that time was that Robles's alleged misconduct did not taint the Blue Thunder investigation:

> Based on our investigation, the additional illegal conduct discussed above occurred within the past twelve to eighteen months, and after the arrests in the *Millan* case, August 1, 1991. We are unaware of any illegal conduct by BECK, TERMINI or ROBLES in connection with the *Millan* case. In fact, ROBLES has been questioned specifically about any wrongdoing in connection with the *Millan* case. ROBLES has stated emphatically that he committed no illegal acts in connection with the *Millan* case and that his illegal conduct did not begin until within the last twelve months.

Affirmation of Assistant United States Attorney David B. Fein, dated March 17, 1993, at ¶ 9. After approving the Government's requested redaction of certain portions of the Fein affirmation, the Court ordered the disclosure of both the Snell and Fein affirmations to the defendants. *See* Order dated March 19, 1993.

On March 22, 1993, in response to additional defense motions, the Court directed the Government to make further disclosures and scheduled a hearing to determine the extent and duration of any police misconduct during the Blue Thunder investigation. *See* Order dated March 22, 1993. At the hearing, which took place on March 23 and 24, 1993, the defense adduced testimony from Raphael Abecasis ("Abecasis")—an inmate at the Metropolitan Correctional Center—concerning conversations Abecasis claimed to have had in jail with another inmate, Joseph Serrano ("Serrano"), regarding Robles's illegal activities. Tr. at 932–42. Following Abecasis's testimony, Serrano—with whom the Government had entered into a cooperation agreement—was examined by defense counsel regarding his prior contacts with Robles, Termini and an unidentified man believed to be a police officer. Tr. at 988, 991–1080, 1087–1154. Serrano revealed that on at least one occasion during the Blue Thunder time

frame, Robles bragged about having taken the proceeds of a "bust" and pocketing the money. Tr. at 988, 1013–15, 1097. Serrano also acknowledged that Robles wore expensive jewelry, including a diamond ring, offered jewelry to Serrano to fence, bought his wife a fur coat and took several trips to Puerto Rico. Tr. at 1018, 1095–96, 1129. After this testimony, defense counsel requested that they be permitted to call Robles, Beck and Termini as witnesses. The Court denied defendants' request on the grounds that they presented no evidence that the three officers were available, or willing, to testify regarding the circumstances surrounding their recent arrests and the extent of their alleged corruption.[2]

In the meantime, on March 23, 1993, the Government disclosed to the Court the conflict of interest of Michael B. Pollack ("Pollack"), attorney for lead defendant Eric Millan, arising from Pollack's impending indictment on felony charges in the District of New Jersey. Tr. at 917; *see also* Affirmation of Assistant United States Attorney Dietrich L. Snell, dated June 18, 1993, at ¶¶ 2–3. As Millan himself was not yet aware of his counsel's conflict, the Court formally apprised him of the situation and proceeded to appoint independent counsel to advise him. Tr. at 924–28. On March 24, 1993, after Millan had conferred with the independent counsel, the Court granted his request for a severance "to see if [Pollack's] situation will clear itself up. . . ." Tr. at 1164.

On March 29, 1993, the Court issued an order addressing the defendants' request for dismissal of the indictment, and other various relief, in light of the investigation of the three officers, the evidence adduced at the hearing, the *ex parte* affirmations and a review of the Government's investigative files. In substance, the Court determined that there was no evidence that the alleged police misconduct had any bearing on the Blue Thunder trial, and thus, denied the defendants' motions for (1) dismissal of the indictment; (2) suppression of the wiretap evi-

---

**2.** At the time of the hearing, neither Robles, Beck or Termini had pled guilty or entered into a cooperation agreement with the Government. Accordingly, the Court determined that the three officers were protected by, and would assert, their Fifth Amendment rights in response to any questions regarding their illegal activities. *See* Order, dated April 16, 1993, at 9 n. 4.

dence; (3) additional opening statements; and (4) appointment of a Special Prosecutor. *See* Order, dated March 29, 1993 (the "March Order"), at 31. Based on the references in the Government's opening statement to Robles's role in the Blue Thunder investigation, however, the Court granted defendants the right to cross-examine Government witnesses as to their personal knowledge of the corruption allegations involving Robles, Beck and Termini during the Blue Thunder investigation. *Id.* at 19–24. The Court also directed the Government to make certain additional disclosures regarding the corruption investigation, *id.* at 27–28, and granted the Government's motion to introduce the wiretaps through summary trial witnesses. *Id.* at 14–19.

Thereafter, during a robing room conference held on April 1, 1993, David Breitbart, attorney for defendant Alfred Bottone, Jr. ("Bottone, Jr."), informed the Court that he had unearthed additional allegations of police misconduct directly affecting this case, namely: (1) $29,000 in cash missing from a safe located at his client's business; and (2) $60,000 in cash missing from the car driven by defendant Carlos Rivera at the time of his arrest. As Breitbart put it, "there was $29,000 in cash that they say they seized from my client, they can't find it. There was $60,000 in another car that Beck drove, they can't find it." Tr. at 1470.

Immediately thereafter, the Government began investigating the validity of Mr. Breitbart's claims of missing money. On April 14, 1993, after interviewing several witnesses, including Carlos Rivera, the Government concluded that an undetermined amount of money was in fact seized from Rivera at the time of his arrest on August 1, 1991 and was now missing. Specifically, the Government

learned that between $50,000 and $80,000, recovered from the trunk of Rivera's car by Agent Beck and Investigator Michael Brosnan, was never vouchered as evidence, and then disappeared.[3] *See* Sealed Affirmation of Assistant United States Attorney Dietrich L. Snell, dated April 14, 1993, at ¶¶ 4, 6.

## 2. *The Mistrial Applications*

When the trial reconvened on April 15, 1993, the Court heard extensive arguments regarding the allegations of missing money. In response to the Government's position that the missing money did not warrant reconsideration of the Court's March 29, 1993 Order, the Court expressed concern that similar revelations might be forthcoming and might further disrupt the trial.[4] Tr. at 1862–67.

Mr. Breitbart, addressing the Court on behalf of Bottone, Jr., argued that the case should be dismissed as the defense had no opportunity to cross-examine the Government's witnesses with respect to the newly-disclosed allegations. Tr. at 1871–72. Alternatively, Mr. Breitbart requested that the Court "reopen the [March 23–24, 1993] hearing so that we can explore these issues more fully with this information." Tr. at 1872.

Speaking on behalf of defendant Vincent Basciano ("Basciano"), Benjamin Brafman similarly protested that the hearing and the defense's cross-examination of the Government's witnesses had been unduly restricted. Tr. at 1873. Mr. Brafman requested, "on behalf of my client and I assume on behalf of everyone", dismissal of the indictment, permission to deliver additional opening statements, reopening of the hearing on police corruption and a *Franks* hearing. Tr. at 1874–75. With respect to dismissing the in-

---

3. The allegations regarding the $29,000 allegedly seized from Bottone's safe have not been substantiated. To the contrary, the Government contends that this claim is without merit. *See* Affirmation of Assistant United States Attorney Dietrich L. Snell, dated June 18, 1993, at ¶¶ 9–10.

4. In fact, shortly thereafter, defendant Basciano claimed that jewelry seized during the search of his home was stolen after it reached NYDETF offices. Tr. at 1918–20. Specifically, Basciano noted a disparity between the number of pieces

of jewelry seized from his home (fifty), and the number of pieces of jewelry listed on an appraisal submitted by the Government (thirty-eight). Tr. at 1919. In addition, defendant Ralph Rivera claimed that certain drug records allegedly seized from his residence on August 1, 1991 were "never there." Tr. at 1924–25. Apparently, neither claim has ever been pursued with the Government. *See* Affirmation of Assistant United States Attorney Dietrich L. Snell, dated June 18, 1993, at ¶¶ 4–6.

dictment, Mr. Brafman acknowledged that "whether your Honor rules that the indictment be dismissed with or without prejudice is a completely separate issues [sic] ..." and emphasized the likelihood that future disclosures would further disrupt the trial. Tr. at 1876–77. Mr. Brafman also intimated that he might have an "obligation ... to ask the Court to stop the proceedings for a sufficient time for me to be able to fully explore, based on the evidence that the Government has now given us, that the corruption existed as of the date of the arrest." Tr. at 1923–24.

After a lunch recess, Mr. Brafman again approached the Court and expressed concern that he "may have misspoken this morning" regarding the relief he was requesting.

> When we moved for a dismissal of the indictment, in the alternative, I don't know whether or not I also asked the court to declare a mistrial which is obviously a different directive. I am, on behalf of my client, asking for the declaration of a mistrial in the alternative if my application for dismissal of the indictment is going to be denied.

Tr. at 1927. Immediately after Mr. Brafman's statement, the following colloquy took place:

> MR. RICHMAN: All defendants, your Honor.
>
> MR. BREITBART: I won't join in that application.
>
> MR. LABUSH: Anthony Bottone joins in that application.
>
>    *     *     *     *     *     *
>
> THE COURT: Okay, ... [l]et's go on.

Tr. at 1927. Thereafter, the trial resumed with further testimony. The day concluded with the defendants' applications—including the latest mistrial request—still pending.

On April 16, 1993, the Court declared a mistrial based primarily on the constant revelations of police misconduct. Tr. at 1984. Specifically, the Court found there was manifest necessity to declare a mistrial in light of (1) the prejudice caused by the Government's opening statement, which intimated that Robles was a reliable, credible witness who would be providing significant testimony at trial; (2) the inability of extensive cross-

examination to address the unpredictable revelations of police misconduct; (3) the constant need to revisit prior Court opinions, recall witnesses and reopen hearings which relied on the Government's representation— now discredited—that the Blue Thunder investigation was not tainted; (4) the Court's inability to cohesively rule on the admissibility of evidence in light of the latest allegations of missing money; (5) the Government's seeming failure to provide defendants and their counsel with all exculpatory and impeachment evidence and lack of diligence in determining the extent and breadth of the corruption; and (6) the lack of viable alternatives to declaring a mistrial. *See* Order, dated April 16, 1993 (the "April Order").

After the Court dismissed the jury, Mr. Maurice H. Sercarz, counsel for defendant Alfred V. Bottone, Sr. ("Bottone, Sr."), objected to the mistrial, claiming not to have heard "anyone say all defendants join in the application." Tr. at 1988. In response, the Court noted that he had an opportunity to object on the previous day, before the mistrial declaration, and had failed to do so. Tr. at 1988.

### 3. *The Defendants' Motions*

Based on the foregoing, defendants Vincent Basciano, Anthony Bottone, Eric Millan, John O'Rourke, Noel Melendez, Ralph Rivera, Samanta Torres and Larry Weinstein (collectively "the Basciano Defendants") now argue jointly that their retrial is precluded by principles of double jeopardy. Specifically, they contend that (1) the Government's misconduct provoked them into applying for a mistrial; and (2) the mistrial was declared over their objection and was not justified by "manifest necessity." Bottone, Sr. moves separately, arguing that he did not consent to a mistrial and there was no "manifest necessity" for granting one. Bottone, Jr. also argues that there was no "manifest necessity" for a mistrial and that his trial should be severed from the other defendants as he alone did not join in the mistrial application. Alternatively, he suggests that double jeopardy should apply because the Government acted in bad faith. Eric Millan also moves separately for release of certain funds seized

and forfeited by the DEA in connection with this action. Defendants Myles Coker, Jose Colon and William Mendoza also move individually, pursuant to Rule 32(d) of the Federal Rules of Criminal Procedure, to withdraw their guilty pleas.

## DISCUSSION

### I. DOUBLE JEOPARDY

#### A. *Standard of Law*

■ Under the Double Jeopardy Clause of the Fifth Amendment, no defendant shall be tried twice for the same crime, *see* U.S. Const. amend. v; *Oregon v. Kennedy*, 456 U.S. 667, 671, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416 (1982); *United States v. Huang*, 960 F.2d 1128, 1133 (2d Cir.1992), *unless* he requests or consents to a mistrial. *United States v. Jorn*, 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543 (1971); *United States v. Huang*, 960 F.2d at 1133. "[W]hen a defendant moves for a mistrial, he sacrifices the right to have a particular tribunal pass judgment, even when that motion is occasioned by judicial or prosecutorial error. Hence, in such circumstance a defendant may be reprosecuted before a different judge and/or jury and such reprosecution is consistent with Fifth Amendment safeguards." *United States v. Pavloyianis*, 996 F.2d 1467, 1472 (2d Cir.1993); *see also United States v. Jorn*, 400 U.S. at 485, 91 S.Ct. at 557. Thus, the Double Jeopardy Clause generally does not bar the retrial of a defendant who has requested a mistrial.

■ The Supreme Court has provided one narrow exception to this broadly stated rule. In *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), the Supreme Court held that in situations where "the mistrial was occasioned by conduct of the trial judge or the prosecutor that was 'intended to provoke the defendant into moving for a mistrial,'" the defendant may not be retried regardless of his consent. *United States v. Huang*, 960 F.2d at 1133 (quoting *Oregon v. Kennedy*, 456 U.S. at 679, 102 S.Ct. at 2091). As the prosecutor's intent determines the applicability of this exception, *see United States v. Huang*, 960 F.2d at 1133, only governmental misconduct which is

intended to "goad" the defendant into moving for a mistrial or prejudicing his possibility of obtaining an acquittal is sufficient. *United States v. Dinitz*, 424 U.S. 600, 611, 96 S.Ct. 1075, 1081, 47 L.Ed.2d 267 (1976); *see also United States v. Pavloyianis*, 996 F.2d at 1475 ("Only where the prosecutor's misconduct was deliberate and the anticipation of acquittal was likely, all as found in the objective facts, does double jeopardy bar retrial."); *United States v. Huang*, 960 F.2d at 1133 ("Negligence, [by the prosecutor] even if gross, is insufficient" to meet the standard). Thus, prosecutorial misconduct that might be seen as sufficient to justify a mistrial on defendant's motion, does not bar retrial absent intent by the prosecutor to avoid an acquittal.

#### B. *The Consenting Defendants*

In the present case, upon learning of allegations of police misconduct involving evidence seized during the Blue Thunder investigation, the Basciano Defendants moved for a mistrial. Though they now claim that the mistrial was granted over their objection, the record of the April 15, 1993 robing room conference, in which the defendants moved "for a declaration of a mistrial if ... [the] application for dismissal of the indictment is going to be denied," (Tr. at 1927), indicates otherwise. At that time, only one defendant, Alfred Bottone, Jr., raised any objection to the mistrial request. Tr. at 1927. The others "all" joined the application. *Id.* at 1927 (reflecting that "[a]ll defendants" join the motion). Accordingly, the Basciano Defendants are bound by their election to seek a mistrial unless the mistrial motion was intentionally provoked by the Government.

■ The Court finds no indication based on an objective review of the facts that the Government acted with the intent to provoke the defendants into moving for a mistrial. Despite the Government's remarks about Robles in its opening statement and failure to apprise the Court before trial as to the investigation into police corruption and Pollack's conflict of interest, the Court has always characterized this conduct as irresponsible, rather than intentional. *See* April Order at 7 (noting that the Court "does not believe that

the Government's actions in this matter were calculated to provoke a mistrial" but rather constituted *unconscious* avoidance of "any police misconduct infecting the *Millan* case"). In fact, the Court finds overwhemling support for the Government's position that it diligently attempted to continue prosecuting the Blue Thunder case. *See* Sealed Affirmation of Assistant United States Attorney Dietrich L. Snell, dated April 14, 1993, at ¶ 15 (urging the Court to maintain the *status quo* and not reverse its prior rulings).

Moreover, even accepting the Basciano Defendants' argument that the Government's actions constituted deliberate misconduct, there is simply no evidence that the Government, which argued strongly against a mistrial, engaged in this activity in order to avoid an imminent acquittal. To the contrary, the Government has always maintained that the evidence against these defendants is overwhelming and certain to insure their conviction, even without Robles's testimony. *See, e.g.,* Government's Memorandum of Law in Opposition to Defendants' Post–Mistrial Motions, dated June 18, 1993 ("Gov't Mem."), at 34–37. Although disclosure to the jury of Robles's alleged crimes may have weakened the prosecution's case, the Government believes that there is still ample evidence to support a conviction. *Id.* at 37. Thus, despite the Basciano Defendants' argument that the Government intentionally provoked them to move for a mistrial, the Court finds nothing in the record suggesting that the Government engaged in misconduct to avoid what·it viewed as a likely acquittal. Accordingly, the Basciano Defendants' motion to preclude retrial on Double Jeopardy grounds is denied.

### C. *The Objecting Defendants*

The two Bottones, on the other hand, are in an entirely different posture as they objected to the declaration of a mistrial.[5] Tr. at 1927, 1985–88. The Bottone defendants argue that the Government has deliberately attempted to insulate the NYDETF investi-

gation from scrutiny and has been less than diligent in reporting evidence of such misconduct to defense counsel. *See* Affidavit of Maurice H. Sercarz, sworn to on May 28, 1993 (the "Sercarz Aff."), at ¶ 56. The Bottone defendants contend further that there was no "manifest necessity" for the mistrial as the Government's conduct and subsequent inability to present a coherent prosecution actually worked to the defendants'. benefit. Sercarz Aff. at ¶ 60; Memorandum of Law, submitted on behalf of Alfred Bottone, Jr., dated May 28, 1993, at 10.

▪ When a mistrial has been declared without the defendant's consent, double jeopardy precludes retrial unless there was "manifest necessity" to declare the mistrial. *Oregon v. Kennedy,* 456 U.S. at 672, 102 S.Ct. at 2087; *United States v. Dinitz,* 424 U.S. at 606–07, 96 S.Ct. at 1079. Lacking the defendant's consent, the Court " 'must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate.' " *Arizona v. Washington,* 434 U.S. 497, 514, 98 S.Ct. 824, 835, 54 L.Ed.2d 717 (1978) (quoting *United States v. Jorn,* 400 U.S. at 486, 91 S.Ct. at 558). The defendant's right to have his trial completed by one court in front of one jury is not absolute, however. As the Supreme Court noted in *Wade v. Hunter,* 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949), "a defendant's valued right to have his trial completed by a particular tribunal *must* in some instances be *subordinated* to the public's interest in fair trials designed to end in just judgments." *Id.* (emphasis added); *see also United States v. Jorn,* 400 U.S. at 480, 91 S.Ct. at 554–55; *United States v. Huang,* 960 F.2d at 1134.

Although a hung jury is the most common example of circumstances in which the need for a mistrial is manifest, *see Oregon v. Ken-*

---

**5.** Although both sides spend considerable time sparring in their papers over whether Bottone, Sr. consented or objected to the mistrial application, the Court recognizes that Mr. Maurice H. Sercarz, Bottone's counsel, did object after the fact. Tr. at 1927, 1985–88. Thus, rather than

grapple with a determination of whether Bottone Sr.'s objection was timely, the Court assumes, for purposes of this opinion, that some defendants consented to the mistrial, while others did not. Accordingly, the Court will address both positions.

*nedy,* 456 U.S. at 672, 102 S.Ct. at 2087, the Supreme Court has also recognized that "[a] trial judge properly exercises his discretion to declare a mistrial if an impartial verdict cannot be reached, or if a verdict of conviction could be reached but would have to be reversed on appeal due to an obvious procedural error in the trial." *Illinois v. Somerville,* 410 U.S. 458, 464, 93 S.Ct. 1066, 1070, 35 L.Ed.2d 425 (1973). Thus,

> Where, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant's consent and even over his objection, and he may be retried consistently with the Fifth Amendment.

*Gori v. United States,* 367 U.S. 364, 368, 81 S.Ct. 1523, 1526, 6 L.Ed.2d 901 (1961); *see also Oregon v. Kennedy,* 456 U.S. at 672, 102 S.Ct. at 2087 (noting that the manifest necessity standard maintains "the public's interest in fair trials designed to end in just judgments.").

■ As set forth in the Court's March and April Orders, the unexpected events in this case, beginning with the Government's general investigation into police misconduct and ending with specific allegations of evidence tampering, constituted manifest necessity for a mistrial. The inherent volatility created by the Government's ongoing corruption investigation and obligation to make daily disclosures of information obtained during the course of that investigation, as well as the defendants' understandable desire to make the corruption issue the centerpiece of their defense, frustrated any measures the Court implemented to ensure that the jury reached an impartial verdict. Indeed, as one defense counsel observed, by April 15, 1993, the Court faced the likelihood of

> a series of interruptions in this trial where your Honor is given new facts and is going to have to revisit the Court's prior decisions. And we're going to end up in a trial in which, in effect, the government misconduct is what this jury is going to be trying rather than the allegations alleged against these defendants.... To put this jury

through another seven months of this exercise where for three months we're going to be trying police corruption and for three months we're going to be trying narcotics allegations, it's not right.

Tr. at 1877–79; *see also* Tr. at 1878 (opining that "this trial is now hopelessly mired in a side issue.").

Specifically, the Court first feared that the testimony the jury was hearing regarding "dirty drug-dealing cops," though largely irrelevant to the facts of this case, was likely to confuse the issues, sidetrack the trial and impede the jury from deciding the guilt or lack of guilt of the defendants based on the evidence in the case. For example, at countless times during the trial, various Government witnesses were asked: (1) whether they had seen Robles "in possession of thousands of dollars in cash" (Tr. at 1103, 1143); (2) if they thought Robles was a "corrupt officer" (Tr. at 1143, 1144, 1494); (3) whether they knew if Robles bought expensive luxurious trips (Tr. at 1143); (4) whether Robles was "selling drugs" (Tr. at 1145, 1390–91, 1495); (5) to describe the crimes of Robles, Beck and Termini (Tr. at 1471–1472, 1491–93); (6) whether "it would be fair to say now that ... Robles was stealing drugs from drug investigations and trying to make money on those drugs" (Tr. at 1475); and (7) whether they would have "turned him [Robles] in" (Tr. at 1495). In addition, each witness, including a court interpreter and Government paralegal, were questioned in depth as to whether they knew Robles, Beck and Termini; the role Robles played in the Blue Thunder investigation; and the circumstances underlying the three arrests. *See, e.g.,* Tr. at 1387–88; 1473–77. As a result, the Court found that the trial was incurably mired in a determination of the guilt or lack of guilt of the three corrupt officers—a determination having no bearing on the guilt or lack of guilt of the Blue Thunder defendants—which precluded the jury's reaching a fair verdict and just judgment.

Second, the Court feared that the jury would be unfairly swayed by the publicity arising directly from the Government's dis-

closures.[6] In fact, by March 29, 1993, two jurors had already become aware of an investigation into police corruption and asked whether if it would affect the case. Tr. at 1084–88; *see also* Tr. at 1090–91 (wherein both the Government and the defense requested that the Court *voir dire* the jury "since there was so much press and so many papers"). Indeed, on April 15, 1993—the day before the mistrial declaration—Bottone, Jr.'s attorney indicated his desire to renew his prior contact with the press and thereby take the case to "the jury of public opinion." Tr. at 1883–84. As the Fifth Circuit recognized in *United States v. Bauman*, 887 F.2d 546, 552 (5th Cir.1989), *cert. denied*, 493 U.S. 1077, 110 S.Ct. 1128, 107 L.Ed.2d 1034 (1990), concern for jury exposure to "prejudicial media influence" constitutes a valid basis for a mistrial. Given the media's interest in the interplay between the corruption investigation and the Blue Thunder trial, fear as to the non-sequestered jury's ability to remain impartial and decide the case based solely on the evidence was justified.

Third, the episodic nature of the Government's corruption disclosures had already compromised the defendants' ability to cross-examine Government witnesses and fully contest the admission of its evidence. *See* April Order at 5 ("The ongoing, unpredictable nature of the Robles investigation, places defendants in the untenable position of having to restrategize, and recall and reexamine witnesses on a daily basis."); *see also* Tr. at 1871 (indicating that two Government witnesses, Special Agent David Dongilli and Special Agent Richard Demurjian, would have to be recalled and cross-examined); Tr. at 1871–72, 1874–75 (requesting that the Court reopen the March 23–24 hearing and/or dismiss the case as the defense had no opportunity to cross-examine the Government's witnesses with respect to the newly

disclosed allegations); Tr. at 1923–24 (intimating that the Court must stop the proceedings so that the extent of police corruption could be fully explored).

Fourth, the Court was forced to continuously revisit prior rulings, including its March Order, and reopen hearings which were predicated on the Government's prior representations—representations which were quickly invalidated—that the corruption investigation had no relevance to the Blue Thunder case. *See* April Order at 5–6; Tr. at 1871–75 (reflecting defense counsel's request, that in light of the Government's latest disclosures, the corruption hearing be reopened and a *Franks* hearing held).

Fifth, the Court was troubled by the Government's inability, while the Robles investigation was still proceeding, to provide defendants and their counsel with all exculpatory and impeachment material and frustrated by the Government's seeming unwillingness to flesh out any evidence which tainted the Blue Thunder case. *See* April Order at 7 (noting the Government's unconscious avoidance of knowledge of police misconduct infecting the *Millan* trial); *see also* Letter from Assistant United States Attorney Dietrich L. Snell to the Honorable Shirley Wohl Kram, dated 3/17/93, at 2 (asserting "the record is clear that all of the allegations against Robles, Beck, or Termini related to events that occurred well after the conclusion of the *Millan* wiretaps."); Letter from Dietrich L. Snell to the Honorable Shirley Wohl Kram, dated 3/24/93, at 1 ("Simply put, there is *no* credible evidence that any misconduct by the NY-DETF officers occurred while the *Millan* investigation was under way."). In fact, as the Court noted in its April Order, "it is the defendants and their counsel, rather than the Government, who have brought to the Court's attention specific instances of misconduct, which allegedly occurred during the

6. Even before the mistrial declaration, the Blue Thunder trial was plagued by prejudicial publicity. *See* Jerry Capeci, *He Sticks Neck Out for Turtles*, Daily News, March 16, 1993, at 16; Patrice O'Shaughnessy, *Police Drug Unit Chief Given New Assignment*, Daily News, March 17, 1993; *Rogue Cop Probe*, Daily News, March 23, 1993 (headline); Mike McAlary, *Tip-offs, Retired Narc Just Couldn't Walk Away*, Daily News, March 23, 1993, at 4–5; Jerry Capeci, *Drug Witnesses: I*

*Robbed With Cops*, Daily News, March 24, 1993, at 15; Selwyn Raab, *Corruption Case May Sway Judge's Ruling in Drug Trial*, N.Y. Times, March 25, 1993; Mike McAlary, *Knuckleheads vs. Rogue Cops*, Daily News, March 25, 1993, at 6; Patricia Cohen and Scott Ladd, *Drug Prosecutors Hit for Misconduct*, N.Y. Newsday, March 30, 1993; Jerry Capeci, *Gotti Lawyer is Court-ed*, Daily News, March 30, 1993.

*Millan* investigation." April Order at 7. Thus, the Court feared, as defense counsel indicated, that the defendants did not possess all exculpatory evidence and impeachment material, and thus, were being deprived of a fundamentally fair trial.

Sixth, in contrast to the cases cited by the defendants where the trial judges declared mistrials precipitously and without due reflection or proper consideration of alternatives, *see, e.g., United States v. Bates,* 917 F.2d 388 (9th Cir.1990); *Lovinger v. Circuit Court of the 19th Judicial Circuit,* 845 F.2d 739 (7th Cir.1988); *United States v. Crotwell,* 896 F.2d 437 (10th Cir.1990); *United States v. Bridewell,* 664 F.2d 1050 (6th Cir.1981), here, the Court declared a mistrial only after carefully considering, and rejecting, other curative measures. *See* April Order at 8–9. As reflected by the March Order, the Court had explored alternatives to granting a mistrial, including expanded cross-examination and additional discovery, and found them insufficient to cure the Court's foremost concerns: the potential that additional exculpatory or impeachment material would be discovered by the Government and the Government's reluctance to actively investigate the full extent of the police corruption while the Blue Thunder trial continued. The Court also considered and rejected a continuance pending completion of the ongoing corruption investigation—which, at the time of the mistrial, would have subjected the jurors to months of uncertain delay—and justifiably determined that a severance of Bottone, Jr., the one "non-consenting defendant," would not overcome the Court's "fear of incurable prejudice in the current proceedings, concerns for judicial economy, and the express consent of all but one of the defendants to a mistrial." April Order at 8–9. In short, by granting a mistrial, the Court was simply agreeing with the defendants that no appropriate "controls" could insure the trial's impartial conclusion. *See* Tr. at 1872 (wherein counsel to Bottone, Jr. opined one day before the mistrial that "[t]here are no controls that can be put into effect here that would be appropriate.").

Therefore, despite the Bottone defendants' argument that the mistrial was declared without manifest necessity, the Court finds that the Government's improper opening statement intimating that Robles would be testifying at trial; inability of defense counsel to address the ongoing revelations of police misconduct through cross-examination; need for the Court to revisit prior rulings, recall witnesses and reopen hearings premised upon stale information; inability of the Government to provide the defendants with all impeachment material and aggressively pursue the corruption investigation while the Blue Thunder case remained pending; likelihood that the jury would not reach a proper verdict in light of these factors; and lack of viable alternatives to salvage the case, together, constituted manifest necessity for a mistrial. Accordingly, the Bottones' motion to preclude their retrial on double jeopardy grounds is denied.

## II. DISMISSAL OF THE INDICTMENT DUE TO "OUTRAGEOUS GOVERNMENTAL MISCONDUCT"

The Basciano Defendants also urge the Court to dismiss the indictment based on the prosecutor's "outrageous governmental misconduct" which, they argue, violates due process. Citing a series of entrapment cases, which indicate that the Government may be barred from prosecuting a defendant if its encouragement or coercion of the defendant to commit the crime is so outrageous that it shocks the conscience and offends due process, the defendants argue by analogy that they may not be retried. *See, e.g., United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973); *Hampton v. United States,* 425 U.S. 484, 490–91, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976); *United States v. Cuervelo,* 949 F.2d 559, 568 (2d Cir.1991); *United States v. Chin,* 934 F.2d 393, 399 (2d Cir.1991). The Court disagrees.

■ Although the Government's behavior in this case clearly falls short of the high standards of professional and ethical responsibility normally attributed to that office, *see United States v. Pavloyianis,* 996 F.2d at 1475, its conduct is not "the kind of behavior that ... shocks the sensibilities of civilized

society," necessary to be of due process concern. *See Moran v. Burbine,* 475 U.S. 412, 433–34, 106 S.Ct. 1135, 1147, 89 L.Ed.2d 410 (1986). "The Due Process Clause is not a code of ethics for prosecutors; its concern is with the manner in which persons are deprived of their liberty." *Mabry v. Johnson,* 467 U.S. 504, 511, 104 S.Ct. 2543, 2548, 81 L.Ed.2d 437 (1984). As the defendants in this case do not, and cannot complain that any Government agent entrapped them into participating in a heroin conspiracy or that they were deprived of their liberty in any fundamentally unfair way, no due process claim exists. Thus, while the crimes of the arrested NYDETF officers may be "shocking," they hardly can be said to have violated the due process rights of these defendants.

Similarly, the defendants' extensive reliance upon this Court's decision in *United States v. Bravo,* 808 F.Supp. 311 (S.D.N.Y. 1992) ("*Bravo* "), to support their due process claim, is not persuasive. In *Bravo,* the Court granted the defendant's request for a new trial, after finding that the government failed to disclose information regarding an investigation into DEA agents associated with the *Bravo* case. Thus, to the extent *Bravo* applies here at all, it supports the Court's decision to retry the case rather than dismiss the indictment. Accordingly, the Basciano Defendants' argument that they should not be retried because of Government misconduct is rejected.

### III. DELAY OF THE RETRIAL

■ The Basciano Defendants further request that the retrial of this case be postponed "until the full extent of the corruption is documented and the legal proceedings against the agents in question concluded." *See* Memorandum of Law in Support of Defendants' Motion ("Def. Mem."), at 41. The Court finds that there is no need to further postpone the retrial.

Contrary to the Basciano Defendants' argument that "additional and, as yet, unnamed officers may also soon be identified and charged," *see* Def. Mem. at 42, the Court finds that the Robles investigation is nearing completion. Not only has the Government secured the guilty pleas of Robles, Beck and Termini, it also has investigated every lead and allegation generated by the corruption investigation, without discovering any misconduct that would preclude the retrial of this case. Specifically, since March 12, 1993, the Government has (1) interviewed all cooperating *Millan* defendants, reviewing what they believed they possessed at the time of their arrests and comparing that to what was vouchered as having been seized from their persons and locations; (2) solicited additional allegations of wrongdoing by sending letters to all cooperating and non-cooperating defendants, enclosing reports showing what had been vouchered from the searches of their persons and locations and asking them to inform the Government if they possessed items that were not accounted for in the reports; (3) interviewed numerous law enforcement officers who participated in the Blue Thunder arrests and searches; (4) interviewed certain civilian witnesses who had information about the searches; and (5) reviewed all of the physical evidence seized during the Blue Thunder investigation, exhibit-by-exhibit. *See* Affirmations of Assistant United States Attorneys David B. Fein and Michael E. Horowitz, dated June 18, 1993 (the "Fein/Horowitz Aff."), at ¶¶ 31–66.

To date, the Government has identified eight additional allegations of misconduct, only one of which—the money seized from Rivera's car—has been verified. Fein/Horowitz Aff. at ¶ 32. These additional allegations include: (1) the missing, undetermined sum of money seized from Rivera's car at the time of his arrest (Fein/Horowitz Aff. at ¶¶ 33–40); (2) the missing $29,000 cash allegedly seized from the safe at Auction Cars (*id.* at ¶¶ 41–50); (3) $5,000 allegedly missing from a brown paper bag belonging to Marcos Delgado (*id.* at ¶¶ 51–52); (4) a missing Macintosh computer located at the residence of Heriberto Rosario (*id.* at 53–56); (5) money and silver certificates which were allegedly seized, but never vouchered, in a search conducted by Robles (*id.* at ¶¶ 56–58); (6) approximately $7,000 in cash allegedly missing from a search conducted by Termini (*id.* at ¶¶ 59–61); (7) $500 purportedly pocketed by Robles during an undercover drug sale (*id.* at ¶¶ 62–63); and (8) the rewriting of one

of Beck's DEA–6 Reports to make it "suitable for court" (*id.* at ¶¶ 64–66). These allegations remain largely unsubstantiated, however, as the claimants have no records to corroborate their allegations of missing money and property; the Government believes other individuals may be responsible for the alleged thefts; and the suspected officers deny any wrongdoing. Although the Court is dismayed that the Government cannot account for the missing items, and in no way endorses the way in which this matter was handled, the Court nonetheless concludes that the internal investigation has by this time yielded the full extent of lost evidence and police misconduct associated with Blue Thunder.

Accordingly, the Court's prior concerns regarding the reopening of hearings, ineffectiveness of cross-examination and full disclosure of all impeachment material are largely put to rest. Although the Government cannot guarantee that no future allegations will surface, the Court finds that this trial can resume without fear of further disruption stemming from unforeseen sources. Accordingly, the Basciano Defendants' request for an additional postponement is denied, and the Court sets an October 12, 1993 trial date for the retrial of this case.

## IV. MOTIONS FOR WITHDRAWAL OF GUILTY PLEAS

■ Defendants Jose Colon ("Colon") and Myles Coker ("Coker") move, pursuant to Fed.R.Crim.P. 32(d) and the Fifth and Sixth Amendments, for leave to withdraw their guilty pleas on the ground that the Government withheld "material" exculpatory evidence from them at the time of their pleas.[7] The Government opposes their motions because (1) the defendants do not now maintain their innocence and (2) the evidence at issue is not "material" under the law.

### A. *Background*

On August 1, 1991, Colon and Coker were arrested and charged with, among other things, participating in the Blue Thunder heroin distribution conspiracy. At the time of their arrests, both Colon and Coker were in possession of heroin packaged for retail street sale, substantial quantities of cash, narcotics records and multiple firearms. Affirmation of Assistant United States Attorney Dietrich L. Snell, dated June 18, 1993, at ¶¶ 11–12. Additional narcotics records, seized during a subsequent search, revealed years of heroin trafficking by both Colon and Coker. *Id.* at ¶ 13.

Colon and Coker participated fully in the pre-trial proceedings of this case. Both received voluminous discovery from the Government and made pre-trial motions that included suppression hearings. In addition, after a hearing held on February 9, 1993, Colon was adjudicated to be competent to stand trial. At no point during any of these lengthy proceedings did either Colon or Coker allege that any Government agents had stolen property or manufactured incriminating evidence.

On February 22, 1993, one week before trial, Colon entered a plea of guilty to Counts One, Two, Three, Four, Five, Ten and Eleven of the ninth superseding indictment pursuant to a plea agreement dated February 21, 1993. In pleading guilty to the counts charged, Colon admitted to his participation in a conspiracy to distribute large quantities of heroin, possessing heroin, and using and carrying firearms in connection with narcotics trafficking.

On March 8, 1993, after participating in jury selection, Coker pled guilty to Counts One, Eight and Nine of the ninth superseding indictment pursuant to a plea agreement. In pleading guilty to the charges contained in those counts, Coker admitted to his participation in a conspiracy to distribute large quantities of heroin, possessing heroin, and

---

7. Although a third defendant, William Mendoza, also moves to have his plea withdrawn, the Court denies the motion as being without merit. Mendoza pled guilty to Count One of the indictment on October 9, 1992. *See* Declaration of Charles Lavine, executed on July 7, 1993, at ¶ 4. At that time, the Government was unaware of the alleged *Brady* material, namely, the criminal investigation, which began in December 1992, of the three officers associated with Blue Thunder. Therefore, the Government could not possibly have violated any disclosure obligation with respect to Mendoza.

using and carrying a firearm in connection with narcotics trafficking.

## B. *The Validity of the Guilty Pleas*

■ Pursuant to Rule 32(d) of the Federal Rules of Criminal Procedure, "the court may permit withdrawal of the plea [of guilty] upon a showing by the defendant of any fair and just reason." Fed.R.Crim.P. 32(d). The defendant has the burden of persuading the Court that valid grounds exist for the plea's withdrawal, *see United States v. Gonzalez,* 970 F.2d 1095, 1100 (2d Cir.1992); *United States v. Marquez,* 909 F.2d 738, 740 (2d Cir.1990), *cert. denied,* 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991), and that such action is "fair and just" taking into account any prejudice resulting to the government. *United States v. Figueroa,* 757 F.2d 466, 475 (2d Cir.), *cert. denied,* 474 U.S. 840, 106 S.Ct. 122, 88 L.Ed.2d 100 (1985); *United States v. Diaz,* 770 F.Supp. 840, 843 (S.D.N.Y.1991), *aff'd,* 956 F.2d 1160 (2d Cir. 1992).

■ The validity of a guilty plea is ascertained by determining whether the plea was intelligent and voluntary, i.e., the defendant had the advice of counsel and understood the consequences of the plea ("intelligent") and was not coerced, threatened, or unable to weigh his options rationally ("voluntary"). *Miller v. Angliker,* 848 F.2d 1312, 1320 (2d Cir.) (citing *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970)), *cert. denied,* 488 U.S. 890, 109 S.Ct. 224, 102 L.Ed.2d 214 (1988); *see also Tate v. Wood,* 963 F.2d 20, 23 (2d Cir.1992) (the "trial court must assure that the plea is entered voluntarily and represents an intelligent choice between the different courses open to a defendant."). This test applies, however, only in the "absen[ce of] misrepresentation or other impermissible conduct by state agents." *Brady v. United States,* 397 U.S. at 757, 90 S.Ct. at 1473. Thus, as "a defendant's decision whether or not to plead guilty is often heavily influenced by his appraisal of the prosecution's case, and of information that may be available to cast doubt on the fact or degree of his culpability, ... even a guilty plea that was 'knowing' and 'intelligent' may be vulnerable to challenge if it was entered without knowledge of material evidence with-

held by the prosecution." *Miller v. Angliker,* 848 F.2d at 1320 (citations omitted).

### 1. *The Giglio Material*

■ Under the due process clause, the government must disclose to the accused all material exculpatory evidence. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). "[T]he suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* This duty to disclose encompasses not only exculpatory evidence, but also evidence that may be available to impeach a prosecution witness. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *Tate v. Wood,* 963 F.2d at 25.

■ A defendant who claims that impeachment information has been withheld by the prosecution is entitled to relief only if the information is "material." *Miller v. Angliker,* 848 F.2d at 1320. In the context of a plea, evidence is "material" if there is a reasonable probability that "but for the failure to produce such information the defendant would not have entered the plea but instead would have insisted on going to trial." *Tate v. Wood,* 963 F.2d at 24. In assessing the likelihood that the defendant would not have entered a plea, the court must objectively examine the persuasiveness of the withheld information. *Id.*

In substance, Coker and Colon claim that shortly after their pleas were entered, they learned, largely through newspaper accounts, that Robles had been arrested and indicted on federal narcotics charges. Therefore, Coker and Colon claim that impeachment evidence going to Robles's credibility was withheld, constituting a "fair and just" reason to permit them to withdraw their guilty pleas. The Court agrees.

■ Contrary to the Government's argument that the corruption information in the present case simply was not "material" to Colon and Coker's decisions to plead guilty, the Court finds a reasonable probability that the defendants would not have entered a

guilty plea, but rather, in light of the internal investigation into police misconduct, would have insisted on going to trial. The corruption investigation had already turned up evidence making incredible the Government's assertions regarding Robles in its opening statement, brought into question the integrity of the undercover buys upon which the Blue Thunder case hinged and eliminated one of the Government's key witnesses. *See Neely v. Pennsylvania*, 411 U.S. 954, 958–59, 93 S.Ct. 1934, 1936–37, 36 L.Ed.2d 416 (1973) (withdraw of guilty plea upheld where, among other things, defendant learned that key prosecution witness would not testify as originally expected); *see also* Affidavit of Myles Coker, sworn to on May 27, 1993, at ¶ 4 ("If I had known or been made aware of the various allegations of corruption ... I would not have accepted the plea agreement or entered a plea of guilty."); Affirmation of Jose Colon, dated June 3, 1993, at ¶ 3 ("If I had known that members of the Drug Enforcement Task Force, ... were themselves under investigation ... I would not have agreed to waive any constitutional rights and to plead guilty."). Thus, the Court finds that an objective review of the facts indicates that *Giglio* material was withheld from these defendants and that in light of such material, the defendants would not have entered their guilty pleas, but instead, would have gone to trial.

### 2. *Prejudice to the Government*

The Government contends that restoration of these two defendants to the case would constitute a hardship as it would (1) "requir[e] the introduction of additional evidence to prove beyond a reasonable doubt the plethora of counts charging *only* those two defendants"; and (2) "only exacerbate the already substantial logistical problems associated with a trial of such proportions." *See* Gov't Mem. at 61. The Court disagrees.

Even if a defendant fails to demonstrate any valid grounds supporting a motion to withdraw a guilty plea, in balancing the equities, the Court may grant the motion if little or no prejudice to the Government would result. *United States v. Fernandez*, 734 F.Supp. 599, 604 (S.D.N.Y.1990), *aff'd*, 932 F.2d 956 (2d Cir.1991). In the case at hand, the Court finds that no prejudice to the Government will result from the reinstatement of not guilty pleas. The trial of the remaining defendants has not yet occurred. Therefore, the addition of two defendants—defendants who were in fact expected to go to trial in the first instance—will not force the Government to reconstruct its case or engage in additional trial preparation. Accordingly, Coker and Colon's motion to withdraw their guilty pleas is granted.

### VI. MOTION REQUESTING FURTHER DISCOVERY AND PERMISSION TO FILE ADDITIONAL PRETRIAL MOTIONS

Counsel in this case also request further discovery, namely, disclosure by the Government of any and all documents relating to the debriefings of Robles, Beck and Termini, and the investigative reports prepared in connection thereto. Defendants claim that these materials clearly represent *Brady* material and are relevant to the issue of governmental misconduct. Specifically, defendants indicate that "these materials would be used by defense counsel in the *Millan* case, to confirm the full extent of the corruption and confirm as well, the legal and practical reasons why this trial should not be permitted to proceed." [8] Affidavit of Benjamin Brafman, sworn to on June 24, 1993, at ¶ 34.

The Court, as it has in prior instances, *see* March Order at 26–28, directs the Government to submit all relevant documents *in camera* to the Court for review. The Court will then determine which, if any, documents

---

8. Defendants also advance arguments that the Government's submission of *ex parte* affirmations, coupled with the Court's decision to disclose redacted versions of those affirmations, has hampered the defendants' ability to mount a defense and probe the extent of Government corruption. The Court strongly disagrees. Each affidavit submitted by the Government has been meticulously reviewed by the Court and provided to the defendants, often over the Government's objection, in the sole interest of complete disclosure. Any redacted material relates solely to matters or individuals having no connection with this case. Thus, the defendants' argument is totally without merit.

constitute *Brady* or *Giglio* material that should be disclosed.

The defendants also request permission to file a further round of pretrial motions. This request will be addressed at a conference, scheduled for Friday, July 30, 1993, at 2:00 p.m.

## VII. MOTION FOR RETURN OF FUNDS SEIZED AND FORFEITED

As a final note, Eric Millan has also moved for release of certain funds seized and forfeited by the DEA in connection with his prosecution on narcotics charges. Millan contends that he needs these funds to pay attorneys' fees. In response, the Government objects and cross-moves for an order directing Millan to retain new counsel or accept assigned counsel to replace Pollack, his original trial attorney.

Although Pollack previously advised the Court that he wished to submit reply papers in further support of Millan's motion, the Court has not yet received further submissions. In fact, in light of Pollack's conviction in the District of New Jersey, the Court is unsure whether Pollack is still representing Millan. Therefore, at this point in time, the Court holds Millan's motion in abeyance pending a determination at the July 30, 1993 conference of (1) who is counsel for Millan; and (2) whether Millan's counsel wishes to submit additional papers in support of the motion to release seized funds.

### CONCLUSION

For the reasons stated above, defendants Vincent Basciano, Alfred V. Bottone, Sr., Alfred Bottone, Jr., Anthony Bottone, Noel Melendez, Eric Millan, John O'Rourke, Ralph Rivera, Samanta Torres and Larry Weinstein's motions to (1) preclude retrial under the Double Jeopardy Clause of the Fifth Amendment; (2) dismiss the indictment based on "outrageous Governmental conduct"; and (3) delay the retrial pending further investigation of allegations of law enforcement corruption are denied. Myles Coker and Jose Colon's motions to withdraw their guilty pleas, pursuant to Fed.R.Crim.P. 32(d), are granted. William Mendoza's motion to withdraw his guilty plea is denied. The Government shall submit all relevant materials regarding the internal police corruption investigation to the Court for an *in camera* review. The defendants' request for permission to file additional pre-trial motions, as well as Eric Millan's motion for release of seized funds, shall be addressed at the conference scheduled for Friday, July 30, 1993 at 2:00 p.m. Finally, the retrial in this matter shall begin on October 12, 1993, at 9:30 a.m.

SO ORDERED.